IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Robert J. Egizio,  :
          Petitioner  :
    :
    v.  :  No. 1055 C.D. 2020
    :  SUBMITTED:  June 11, 2021
Consol Pennsylvania Coal Company,  :
LLC (Workers' Compensation Appeal :
Board),  :
          Respondent  :

BEFORE:    HONORABLE MARY HANNAH LEAVITT, Judge[1]
              HONORABLE MICHAEL H. WOJCIK, Judge
              HONORABLE ELLEN CEISLER, Judge

<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION
BY JUDGE CEISLER                           FILED:  January 20, 2022

      Robert J. Egizio (Claimant) petitions this Court for review of the September 22, 2020 order of the Workers' Compensation Appeal Board (Board), affirming in part the decision of a workers' compensation judge (WCJ), which granted Claimant's review and claim petitions seeking workers' compensation benefits for injuries Claimant sustained on June 25, 2014 (2014 injury), and January 13, 2016 (2016 injury), while employed as a coal miner for Consol Pennsylvania Coal Company (Employer).  The Board modified the WCJ's decision and terminated Claimant's benefits as to the 2014 injury after concluding that Claimant had fully recovered from that injury.  After review, we reverse the Board's order terminating Claimant's benefits for the 2014 injury.  We affirm the Board's order in all other respects.

---

[1] This matter was assigned to the panel before January 3, 2022, when President Judge Emerita Leavitt became a senior judge on the Court.

# I. Background

## A. 2014 Injury

Claimant worked as a general laborer inside one of Employer's coal mines for approximately five and a half years. Reproduced Record (R.R.) at 21a. He sustained the 2014 injury on June 25, 2014, when he slipped in mud and fell while pulling a wooden pallet out of a dumpster. R.R. at 27a. Claimant heard a pop in his left leg, followed by pain and a burning sensation in his left knee. *Id.* He reported the injury to Employer and went to the emergency room. *Id.* at 28a. Claimant was treated and released with crutches, a brace, and instructions to follow up with Employer's medical provider. *Id.* at 28a. Claimant returned to work the next day with light-duty restrictions, which included no heavy lifting. *Id.* at 30a, 34a. He continued to work "roughly" the same hours he had prior to the 2014 injury, at his regular rate of pay. *Id.* at 30a-31a, 66a. While neither Claimant nor Employer filed any documents regarding the 2014 injury with the Bureau of Workers' Compensation, Employer covered Claimant's related medical expenses. *Id.* at 551a.

On December 19, 2014, Claimant's treating physician, David Welker, M.D., modified Claimant's work restrictions, permitting him to carry up to 40 pounds, climb stairs, and stand or walk up to 8 hours per shift. Certified Record (C.R.), Item No. 32. Dr. Welker released Claimant to unrestricted duty on January 13, 2015. *Id.*, Item No. 33.

## B. The 2016 Injury

Claimant sustained the 2016 injury on January 13, 2016, when he tripped and fell, landing on his left knee. R.R. at 46a. Claimant reported the incident to Employer and sought treatment from Dr. Welker, who took Claimant out of work. *Id.* at 47a-48a. Dr. Welker performed surgery for a torn meniscus on Claimant's left

knee on February 16, 2016. *Id.* at 48a. Employer accepted liability for the 2016 injury, which Employer described as a left knee contusion, through the issuance of a Notice of Compensation Payable. C.R., Item No. 63.

On October 17, 2016, Claimant filed a review petition seeking to amend the description of the 2016 injury to include a torn meniscus.[2] Claimant also filed a claim petition seeking partial disability benefits for the 2014 injury, which he alleged included tears to his left anterior cruciate ligament (ACL) and medial collateral ligament (MCL), and a penalty petition alleging that Employer violated the Workers' Compensation Act (Act)[3] when it failed to file "necessary workers' compensation documents" with regard to the 2014 injury. *Id.*, Item Nos. 2, 5. Employer denied that Claimant suffered any wage loss due to the 2014 injury and denied that it violated any provisions of the Act. *Id.*, Item Nos. 4, 10. Claimant filed additional penalty petitions on May 31, 2017, alleging that Employer failed to pay for medical treatment related to the 2014 injury and 2016 injury. *Id.*, Item No. 8. Employer denied these allegations. *Id.*, Item No. 10.

On October 17, 2016, Claimant underwent an independent medical exam (IME) conducted by Jeffrey Kann, M.D. R.R. at 9a. Based on the results of the IME, Employer filed a petition to terminate Claimant's benefits for the 2016 injury on the basis that Claimant had fully recovered. *Id.* The WCJ consolidated the two matters and took evidence over the course of several hearings in 2017 and 2018.

---

[2] Claimant's review petition was not made part of the certified record in this matter or included with the reproduced record filed with this Court. Employer agreed, however, at a January 24, 2017 hearing before the WCJ that the 2016 injury included a torn medial meniscus. R.R. at 69a.

[3] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710.

## C. Claimant's Evidence

Claimant testified live before the WCJ on January 24, 2017, June 19, 2018, and November 27, 2018. His job working in the coal mine was very physical in nature and required that he carry up to 80 pounds while walking long distances over uneven surfaces. *Id.* at 22a. At times, Claimant was forced to stoop while carrying heavy objects due to the low ceiling in the mine, which was also dimly lit. *Id.* at 22a-23a. Claimant had to pass a series of physical tests before he was qualified to work in the mine. *Id.* at 23a. He had no issues with his left knee prior to sustaining the 2014 injury. *Id.* at 24a.

Claimant's left knee pain persisted following the 2014 injury, even while working the light-duty position, and he had difficulty squatting, kneeling, and walking up and down stairs. *Id.* at 36a, 39a, 102a. Physical therapy did not improve his pain symptoms. *Id.* at 46a. Claimant asserted that he asked Dr. Welker to lift his work restrictions after Employer advised him that the light-duty job would not "last forever." *Id.* at 38a. Claimant conceded that he did not seek treatment for the 2014 injury between May 2015, when Dr. Welker released him from his care, and the date he sustained the 2016 injury, and he did not attend physical therapy. *Id.* at 65a. Claimant maintained, however, that his pain symptoms from the 2014 injury had never resolved and had been aggravated by the 2016 injury. *Id.* at 47a. Claimant did not believe he could return to his pre-injury job with Employer, in part because he did not believe he could pass the physical test required for the position. *Id.* Although Claimant could not say whether Employer paid his medical expenses related to the 2014 injury, he acknowledged that "somebody was paying for them," as he had not received any medical bills. *Id.* at 58a, 60a.

4

Claimant submitted the deposition of Dr. Welker, who first examined Claimant on August 7, 2014. *Id.* at 227a. Based on his examination and review of a July 28, 2014 magnetic resonance imaging (MRI) of Claimant's left knee, Dr. Welker opined that Claimant suffered a fracture to his left lateral femoral condyle and a sprain to his left MCL, both of which Dr. Welker attributed to the 2014 injury. *Id.* at 231a, 233a, 244a. Dr. Welker treated the 2014 injury with physical therapy and work restrictions. *Id.* at 232a. Following a December 16, 2014 examination, Dr. Welker revised Claimant's restrictions to permit lifting and carrying up to 40 pounds, climbing stairs, and standing and walking up to 8 hours per shift. *Id.* at 237a. Dr. Welker released Claimant to his pre-injury job on January 13, 2015. *Id.* at 238a-39a.

A subsequent MRI from April 6, 2015, indicated that Claimant's femoral condylar fracture had healed and his ligamentous injury had mended itself "in large part[.]" *Id.* at 242a. In a May 19, 2015 office note, Dr. Welker suggested that the pain in Claimant's left knee "[might] give him trouble down the road," given his line of work. *Id.* at 319a. If Claimant did have trouble, Dr. Welker felt that it would directly relate to the 2014 injury. *Id.* at 243a. Although Dr. Welker believed that Claimant had recovered enough to do "some work" by the time Claimant stopped treating with him in May 2015, he did not agree that Claimant had fully recovered from the 2014 injury. *Id.* at 263a-64a.

Dr. Welker resumed his treatment of Claimant following the 2016 injury, which required a surgical repair to Claimant's left meniscus on February 16, 2016. *Id.* at 245a. Dr. Welker kept Claimant out of work thereafter and throughout the duration of his treatment in 2016. *Id.* at 250a. While an April 18, 2016 arthrogram revealed that the meniscus tear was gone, and Dr. Welker found no evidence of a

5

residual tear, the arthrogram documented a softening of the articular cartilage in Claimant's lateral femoral condyle, which had been fractured in the 2014 injury. *Id.* at 249a-50a, 271a. Dr. Welker opined that these changes were "directly related to his injury[.]" *Id.* at 250a.[4]

Dr. Welker agreed on cross-examination that Claimant had "objectively recovered" from the 2016 injury as of October 18, 2016, the date of Dr. Welker's last examination. *Id.* at 276a. Dr. Welker's office note from that date indicates that Claimant was still "struggling with regards to pain[,]" and that Dr. Welker intended to "ask for a second opinion through worker[s' compensation[.]" *Id.* at 330a. Dr. Welker continued Claimant's existing work restrictions, which kept Claimant out of work. C.R., Item No. 34.

In an April 5, 2017 written report, Dr. Welker related that Claimant's diagnosis consisted of "left knee pain secondary to degenerative changes of the patellofemoral joint," which Dr. Welker attributed to the 2014 injury and 2016 injury. R.R. at 303a. Although Dr. Welker stated that he would not impose physical restrictions on Claimant at that time, if Claimant's knee pain prevented him from working as a coal miner, Dr. Welker believed "it [was] causally related to [Claimant's] injury."[5] *Id.* Dr. Welker further opined that Claimant would "continue

---

[4] We can infer that Dr. Welker associates the changes he observed in the articular cartilage of Claimant's lateral femoral condyle to the 2014 injury, as that injury caused a fracture to the left femoral condyle. See *Edwards v. Workers' Comp. Appeal Bd. (Epicure Home Care, Inc.)*, 134 A.3d 1156, 1161 (Pa. Cmwlth. 2016) (reviewing court must view evidence in the light most favorable to the prevailing party and give it the benefit of all inferences reasonably deduced from the evidence).

[5] In 2015, when Dr. Welker related that Claimant's knee could cause problems in the future, it was clear he meant the 2014 injury, since Claimant had not yet sustained the second work injury. Although Dr. Welker does not specify in his 2017 report which injury may cause Claimant trouble in the future, we may fairly assume he refers to both injuries, as he opined each injury caused changes to the "patellofemoral joint." R.R. at 303a.

6

to potentially have issues with pain in his knee" that "directly related to his injury." *Id.* Claimant could "potentially go back to doing some form of work in the coal mine[;]" however, "alterations in the work environment or some restrictions" may be required. *Id.* at 304a.

Claimant also submitted the deposition testimony of Scott K. Schweizer, M.D., who first examined Claimant on March 13, 2017. *Id.* at 122a, 450a. Based on the results of this exam and his review of Claimant's medical records, Dr. Schweizer performed surgery on Claimant's left knee on March 30, 2017. *Id.* at 455a. The purpose of the March 30, 2017 surgery was to restore the cartilage in the knee and "repair or reconstruct [Claimant's] medial patellofemoral joint." *Id.* at 454a. Dr. Schweizer opined that Claimant's 2014 injury was a "textbook" patella dislocation, which progressively worsened, and the meniscus tear sustained in the 2016 injury was causally related to the 2014 injury. *Id.* at 452a, 469a. Furthermore, Dr. Schweizer believed that any degenerative changes present in Claimant's knee were post-traumatic in nature, which related back to the 2014 injury. *Id.* at 484a. Dr. Schweizer conceded during cross-examination that he may not have reviewed the original films for some of Claimant's MRIs. *Id.* at 472a. He agreed that, during the March 30, 2017 surgery, he found no evidence of a residual injury to Claimant's lateral femoral condyle. *Id.* at 488a, 492a.

Dr. Schweizer had not released Claimant to work because he did not believe Claimant's left knee was in a condition that would allow him to return to his pre-injury job as a coal miner. *Id.* at 457a.

### D. Employer's Evidence

In support of its petition seeking to terminate Claimant's benefits for the 2016 injury, Employer submitted the December 7, 2017 deposition of Dr. Kann, who

7

performed an IME of Claimant on October 17, 2016.[6] R.R. at 346. After reviewing Claimant's medical history, Dr. Kann performed a physical exam on Claimant, during which he observed no objective abnormalities in Claimant's left knee. *Id.* at 353a, 365a. Dr. Kann opined that the 2014 injury consisted of an "[MCL] sprain, as well as a non-displaced fracture on the posterior lateral corner of the lateral femoral condyle of the femur," and that the 2016 injury involved "a medial meniscal tear." *Id.* at 359a. Dr. Kann related that the vast majority of MCL injuries heal without surgical intervention. *Id.* at 362a. He felt that Dr. Welker appropriately treated Claimant's meniscal tear and noted the lack of ongoing pathology in "that part" of Claimant's knee. *Id.* Dr. Kann opined that Claimant's imaging studies demonstrated that Claimant's fractured condyle had healed. *Id.* at 363a. Claimant's MRI scans did indicate mild degenerative changes; however, Dr. Kann did not believe they were related to the 2014 injury or 2016 injury. *Id.* at 376a-77a. Dr. Kann further opined that Claimant had recovered from both injuries and he could be released to full-duty work without restrictions as of October 17, 2016. *Id.* at 376a, 418a.

Dr. Kann disagreed with Dr. Schweizer's opinion that Claimant suffered a dislocated patella, as none of Claimant's MRIs showed any evidence that his left kneecap had been dislocated. *Id.* at 366a-68a, 373a. Dr. Kann explained that the only way the patella can dislocate from its joint is by tearing the medial patella femoral ligament, which has a small artery running through it. *Id.* at 368a. A dislocated patella, universally, results in a tear to the artery as well, which in turn causes internal bleeding and "an extremely large effusion," which makes the knee

---

[6] Employer also presented the deposition testimony of Lisa Davis and Phyllis Pellarin, both of whom work for Employer's workers' compensation insurer. We need not recount their testimony relating to the payment of Claimant's medical bills, as that is not an issue before this Court.

8

look "like a grapefruit." *Id.* at 368a-69a, 374a. None of Claimant's medical history, or diagnostic imaging reports, described such an effusion, or any tear of the medial patella femoral ligament. *Id.* at 369a, 372a, 374a. Dr. Kann further noted that Claimant had returned to work initially and explained that it would be impossible for him to bear weight on his knee if it had, in fact, been dislocated. *Id.*

### E. WCJ Decision

In a September 19, 2019 decision, the WCJ credited Claimant's uncontradicted testimony as to how the 2014 injury occurred. C.R., Item No. 11, WCJ Decision, Finding of Fact (F.F.) No. 22. The WCJ also credited Claimant's testimony "that he worked light duty for [Employer] with a wage loss" after the 2014 injury. F.F. Nos. 10(h), 22. He rejected Claimant's testimony to the extent it was inconsistent with the credible medical testimony. F.F. No. 22. The WCJ found the medical opinions of Dr. Kann and Dr. Welker credible, as they agreed that Claimant's 2014 injury consisted of a fracture to the femoral condyle and an injury to his MCL, and that the 2016 injury included a torn meniscus. F.F. No. 23. The WCJ rejected Dr. Schweizer's opinion that Claimant suffered a patella dislocation from the 2014 injury. *Id.* The WCJ noted that Dr. Kann's examination revealed no objective findings to support Dr. Schweizer's diagnosis, and he was persuaded by Dr. Kann's "very detailed and logical reason[s]" for disagreeing with Dr. Schweizer, who failed to provide a similarly detailed explanation in support of his opinion. *Id.*

Based on the credited evidence, the WCJ found that Claimant's 2014 injury to his left knee caused a fracture of the lateral femoral condyle and an injury to the MCL, which rendered Claimant disabled from performing his full-duty job and entitled him to partial disability benefits "based upon any actual wage loss" for the period of June 25, 2014, through January 13, 2016, the date that Claimant sustained

9

the 2016 injury. F.F. No. 25, Conclusion of Law (C.O.L.) No. 2. The WCJ directed that Employer pay Claimant partial disability benefits "to the extent he experienced any wage loss," and suspended Claimant's benefits as of January 13, 2016. WCJ Decision at 12.

The WCJ found that the 2016 injury included a torn left meniscus, from which Claimant had fully recovered as of October 17, 2016. F.F. Nos. 24, 26. Thus, the WCJ granted Claimant's review petition seeking an amendment to the description of the 2016 injury and granted Employer's termination petition. C.O.L. No. 1, WCJ Decision at 12. The WCJ denied Claimant's penalty petitions, as Claimant failed to demonstrate that Employer violated any provisions of the Act and there was no evidence to suggest that Employer failed to pay for any treatment related to Claimant's recognized injuries. F.F. No. 27, C.O.L. No. 3, WCJ Decision at 12.

### F. Board Decision

Employer appealed to the Board, arguing that the WCJ should have terminated Claimant's partial disability benefits for the 2014 work injury, effective October 17, 2016, as the credible medical evidence demonstrated that Claimant had fully recovered from the 2014 injury. C.R., Item No. 12. Employer also argued that the record did not support an award of partial disability benefits for the 2014 injury, as Claimant testified that he suffered no wage loss.[7]

The Board affirmed the WCJ's decision with respect to the nature of Claimant's two work injuries and as to the termination of Claimant's benefits for the 2016 injury. C.R., Item No. 16, Board Decision at 16, 18. Regarding the 2014

---

[7] Claimant also appealed the WCJ's decision, arguing that the WCJ capriciously disregarded Dr. Schweizer's opinion that Claimant suffered a patella dislocation and that the WCJ erred in denying Claimant's penalty petitions. The Board rejected these arguments, noting that it is the WCJ's prerogative to determine witness credibility and evidentiary weight. C.R., Item No. 16, Board Decision at 19.

10

injury, however, the Board noted that the WCJ credited the opinions of both Dr. Kann and Dr. Welker, who testified that Claimant had fully recovered from the 2014 injury. *Id.* at 18. Therefore, the Board concluded that the WCJ erred in suspending, rather than terminating, Claimant's benefits for the 2014 injury. *Id.* Accordingly, the Board modified the WCJ's decision to reflect that Employer was entitled to a termination of benefits for both the 2014 injury and the 2016 injury, effective October 17, 2016. *Id.* at 20. The Board agreed with Employer that Claimant did not suffer any wage loss from the 2014 injury; however, the Board considered the issue moot, as the WCJ only directed that Employer pay partial disability benefits "to the extent" Claimant suffered a wage loss. *Id.* at 18-19. This appeal followed.

## II. Issues

On appeal,[8] Claimant argues that, in terminating Claimant's partial disability benefits for the 2014 injury, the Board usurped the WCJ's role as factfinder, improperly reweighed the evidence, and substituted its own conclusions and determinations for those of the WCJ.[9] Claimant also argues that the Board erred in overturning the WCJ's award of partial disability benefits, as Claimant's uncontradicted testimony demonstrated that he suffered a wage loss following the 2014 injury.

---

[8] On review, we are limited to "determining whether findings of fact are supported by substantial evidence, whether an error of law has been committed, or whether constitutional rights have been violated." *Kush v. Workers' Comp. Appeal Bd. (Power Contracting Co.)*, 186 A.3d 1047, 1050 n.4 (Pa. Cmwlth. 2018) (citing 2 Pa. C.S. § 704). "The scope of review on questions of law is plenary and the standard of review is de novo." *Id.*

[9] We have combined Claimant's first two arguments, as they both relate to whether the Board improperly modified the WCJ's decision that suspended Claimant's benefits for the 2014 injury.

11

### III. Discussion

In a claim petition, the claimant bears the burden of establishing a right to compensation and proving all necessary elements to support an award of benefits, including the duration and extent of the disability alleged. *Coyne v. Workers' Comp. Appeal Bd. (Villanova Univ.)*, 942 A.2d 939, 945 (Pa. Cmwlth. 2008). Disability is a term of art under the Act which is generally synonymous with a loss of earning power resulting from a work-related injury. *Whitfield v. Workers' Comp. Appeal Bd. (Tenet Health Sys. Hahnemann LLC)*, 188 A.3d 599, 612 (Pa. Cmwlth. 2018). A suspension of benefits is proper if the claimant's work-related disability exists but does not manifest itself in a loss of earning power. *Consol. Freightways v. Workmen's Comp. Appeal Bd. (Jester)*, 603 A.2d 291, 294 (Pa. 1992). "[A] termination of benefits is properly granted only when a claimant's work-related injury ceases *entirely*." *Id.* (emphasis in original).

The WCJ is the ultimate finder of fact and the exclusive arbiter of credibility and evidentiary weight. *Lindemuth v. Workers' Comp. Appeal Bd. (Strishock Coal Co.)*, 134 A.3d 111, 125 (Pa. Cmwlth. 2016). In executing his role as factfinder, the WCJ is free to accept or reject, in whole or in part, the testimony of any witness. *Id.* A WCJ's credibility determinations are due substantial deference and may only be overturned if they are "arbitrary and capricious or so fundamentally dependent on a misapprehension of material facts, or so otherwise flawed, as to render [them] irrational." *Casne v. Workers' Comp. Appeal Bd. (STAT Couriers, Inc.)*, 962 A.2d 14, 19 (Pa. Cmwlth. 2008). It is irrelevant whether the record contains evidence to support findings other than those made by the WCJ; the inquiry before this Court is whether evidence exists to support the findings actually made. *Minicozzi v.*

*Workers' Comp. Appeal Bd. (Indus. Metal Plating, Inc.)*, 873 A.2d 25, 29 (Pa. Cmwlth. 2005).

## A. Termination of Benefits

First, we address whether the Board erred in modifying the WCJ's decision suspending Claimant's benefits for the 2014 injury. Claimant argues that the Board, in terminating his benefits for the 2014 injury, improperly reweighed the evidence and the WCJ's credibility determinations. Claimant maintains that the credible evidence supported the WCJ's suspension of his partial disability benefits for the 2014 injury.

While findings of fact and credibility determinations are entirely within the province of the WCJ, Section 424 of the Act, 77 P.S. § 855, vests the Board with the authority to sustain, reverse, or modify a WCJ's decision, as the Board deems proper, whenever an appeal is based upon an error of law. As a result, the Board is the final authority with regard to conclusions of law that are then subject to review by this Court. *Carmen Paliotta Gen. Constr. v. Workmen's Comp. Appeal Bd. (Tribuzio)*, 528 A.2d 274, 277 (Pa. Cmwlth. 1987).

In summarizing the evidence that led the Board to modify the WCJ's decision, the Board cited Dr. Welker's testimony that Claimant had "objectively recovered and had no work restrictions." Board Decision at 18. This testimony related to the 2016 injury, however, not the 2014 injury. As to the 2014 injury, Dr. Welker explicitly declined to say that Claimant had fully recovered from the 2014 injury, although he felt that Claimant had recovered enough to "do some work." R.R. at 263a-64a, 276a. An April 18, 2016 arthrogram of Claimant's left knee revealed changes to the articular cartilage in Claimant's lateral femoral condyle, which both Dr. Welker and Dr. Kann agreed had been fractured in the 2014 injury. R.R. at 233a,

13

250a, 359a. Dr. Welker attributed these changes to Claimant's 2014 injury. R.R. at 250a. In his April 5, 2017 written report, Dr. Welker causally related the condition of Claimant's left knee to both the 2014 injury and 2016 injury. R.R. at 303a. Although Dr. Welker stated that he would not impose physical restrictions on Claimant at that time, he suggested that, if Claimant's knee pain "preclude[d] [Claimant] from doing his job as a coal miner[,]" he believed "it [was] causally related to [Claimant's] injury." *Id.*

We do not dispute the Board's underlying authority to modify the WCJ's decision. Based on our review of the record, however, we agree with Claimant that the WCJ's decision to suspend Claimant's benefits for the 2014 injury was supported by the evidence presented and that the Board erred in terminating those benefits.

### B. Wage Loss

Next, Claimant argues that the Board erred in concluding that Claimant was not entitled to partial disability benefits from June 25, 2014, through January 13, 2016, as the WCJ accepted Claimant's uncontradicted testimony that he suffered a wage loss following the 2014 injury. Although Claimant indicated during testimony that he worked "roughly" the same hours following the 2014 injury, he could not recall the exact hours or days. Claimant's Br. at 32. Moreover, Claimant's continued pain and symptoms kept him from full-duty work; therefore, Claimant contends that he was entitled to partial disability.

At the outset, we must point out that Claimant appears to have misapprehended the Board's order, which did not disturb the WCJ's award with respect to partial disability. The Board merely noted that the issue was moot, as the WCJ's order only directed payment of partial disability benefits for the 2014 injury "to the extent [Claimant] had a wage loss from June 25, 2014, to January 13, 2016."

14

WCJ Decision at 12. We also recognize that Employer did not appeal the Board's order that left intact the WCJ's award of wage loss benefits.

The Board is correct that Claimant testified "multiple times" that he worked the same hours and days, including overtime, as he did prior to the 2014 work injury, and he received the same rate of pay. Board Decision at 19. At the January 24, 2017 hearing before the WCJ, Claimant agreed that he worked "roughly" the same hours and stated that he worked five days a week and "worked the weekends if [he] could[.]" R.R. at 30a-31a. Claimant confirmed this testimony during cross-examination. *Id.* at 60a, 65a. At a subsequent hearing held on June 19, 2018, Claimant once more agreed that, after returning to work after the 2014 injury, he worked his regular hours and received his regular earnings up through the date of the 2016 injury. *Id.* at 121a.

Despite this testimony, the WCJ credited Claimant's "testimony that he worked the light[-]duty job with a wage loss after the 2014 injury[,] as that testimony is uncontradicted." F.F. No. 22. Although there is insufficient evidence to support a finding that Claimant suffered a wage loss from the 2014 injury, the Board is correct that Employer is only obligated to pay Claimant partial disability benefits "to the extent he had a wage loss" for the period of June 25, 2014, through January 13, 2016. This qualifying language renders harmless any error the WCJ may have committed in awarding wage loss benefits for the 2014 injury.

## IV. Conclusion

Because substantial evidence exists to support a conclusion that Claimant had not fully recovered from the 2014 injury, the Board erred in terminating Claimant's benefits for that injury as of October 17, 2016. Substantial evidence does not exist to support an award of wage loss benefits. Employer did not appeal the Board's

15

order, however, and Employer's financial obligation is limited "to the extent" of Claimant's nonexistent wage loss. Accordingly, we reverse the Board's order terminating Claimant's partial disability benefits for the 2014 injury and reinstate the WCJ's order suspending those benefits as of January 13, 2016. We affirm the Board's order in all other respects.

_____
ELLEN CEISLER, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Robert J. Egizio,                          :
                    Petitioner             :
                                           :
          v.                               :  No. 1055 C.D. 2020
                                           :
Consol Pennsylvania Coal Company,          :
LLC (Workers' Compensation Appeal          :
Board),                                    :
                    Respondent             :

## **O R D E R**

AND NOW, this 20th day of January, 2022, the September 22, 2020 order of the Workers' Compensation Appeal Board (Board) is hereby REVERSED to the extent it terminated Robert J. Egizio's (Claimant) workers' compensation benefits for the work injury sustained on June 25, 2014. The order of the workers' compensation judge suspending Claimant's benefits effective January 13, 2016, is reinstated. The Board's September 22, 2020 order is AFFIRMED in all other respects.

_____
ELLEN CEISLER, Judge